IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
5:12-MJ-01508-JG-1

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | **MEMORANDUM &** |
| ) | **ORDER** |
| MELISSA S. MORTON, ) | |
| ) | |
| Defendant ) | |

This matter comes before the Court upon the Defendant's motion to suppress (DE 28) challenging the constitutionality of a checkpoint. Defendant was charged in a misdemeanor information on July 11, 2012 with one count of driving while intoxicated in violation of 18 U.S.C. §§ 13, assimilating North Carolina General Statute § 20-138.1. (DE 1). She entered a not guilty plea on July 10, 2013 and again on October 9, 2013. Defendant filed the present motion on November 8, 2013. The time for filing any responses or replies has expired and the motion is now ripe for adjudication. For the following reasons, the motion to suppress is DENIED.

## I. BACKGROUND

On March 17, 2012, law enforcement from the Fort Bragg Provost Marshal's Office conducted a checkpoint on Highway 87 in the vicinity of Bragg Boulevard and Gruber Road. Lieutenant Jason J. Tatro was the officer in charge. The checkpoint procedures were contained in an Operations Order, which set forth the time, date and location of the checkpoint and stated its purpose was "to reduce traffic crashes, injuries and deaths resulting from impaired driving." (DE 30 at 10). The Operations Order directed, *inter alia.*, that every vehicle be stopped, every driver produce his/her driver's license and that officers observe drivers for signs of impairment and to look for open containers. (*Id*).

The Government contends that around 11:45 p.m., Defendant was operating a vehicle that was stopped at the checkpoint by Specialist Poole. The Defendant was asked to step out of her vehicle and the investigation for suspicion of impaired driving commenced. Poole asserts that she displayed slurred speech, bloodshot watery eyes, and was unable to maintain her balance. Due to her performance in a series of field sobriety tests, Defendant was taken to the Provost Marshal's Office and asked to provide consecutive breath samples into an Intox EC/IR-II, where her blood alcohol concentration was measured at 0.17%. She was cited for driving while impaired in violation of N.C.G.S. § 20-138.1.

**II. STANDARD OF REVIEW**

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "[T]he underlying command of the Fourth Amendment is always that searches and seizures be reasonable." *Wilson v. Arkansas*, 514 U.S. 927, 931, 115 S.Ct. 1914, 131 L.Ed.2d 976 (1995).

When a police officer stops an automobile and detains the occupants briefly, the stop amounts to a seizure within the meaning of the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809–10, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996); *see also United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) (noting that the Fourth Amendment's protection against "unreasonable searches and seizures" extends to "brief investigatory stops of persons or vehicles"); *see also Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 450, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990) (stopping a vehicle at a checkpoint constitutes a seizure of a person within the meaning of the Fourth Amendment).

"A search or seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing." *City of Indianapolis v. Edmond*, 531 U.S. 32, 37, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000). The Supreme Court has recognized, however, that there are "limited circumstances in which the usual rule does not apply." *Id*. Such limited circumstances include roadblocks, *see United States v. Martinez-Fuerte*, 428 U.S. 543, 566-67, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976) (upholding a suspicionless seizure at a checkpoint aimed at intercepting illegal immigrants), and sobriety checkpoints, *see Sitz*, 496 U.S. at 455, 110 S.Ct. 2481 (upholding sobriety checkpoint aimed at combating drunk driving) but do not include checkpoints set up for general crime prevention, including drug interdiction. *Edmond*, 531 U.S. at 41–42, 121 S.Ct. 447.

The constitutionality of a checkpoint is determined by inquiring into both the primary purpose of the checkpoint as well as its reasonableness. A primary purpose that seeks to advance general interests of crime control is per se invalid under the Fourth Amendment. *United States v. Faulkner*, 450 F.3d 466, 469–70 (9th Cir. 2006). However, if the primary purpose is valid, the court must then evaluate the checkpoint's reasonableness on the basis of individual circumstances. *Illinois v. Lidster*, 540 U.S. 419, 426, 124 S.Ct. 885, 157 L.Ed.2d 843 (2004). This requires balancing "the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." *Id*. at 420, 427, 124 S.Ct. 885 (quoting *Brown v. Texas*, 443 U.S. 47, 51, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979)). In determining the intrusiveness of a checkpoint, a court may weigh the factors including whether the checkpoint: (1) is clearly visible; (2) is part of some systematic procedure that strictly limits the discretionary authority of police officers; and (3) detains drivers no longer than is reasonably necessary to accomplish the purpose of checking a

3

license and registration, unless other facts come to light creating a reasonable suspicion of criminal activity. *McFayden*, 865 F.2d at 1311-12 (citations omitted).

## III. ANALYSIS

Defendant challenges the constitutionality of the checkpoint asserting not only was the purpose of the checkpoint unconstitutional but also that Lt. Tatro's "unbridled" discretion in conducting was unreasonable and renders the checkpoint unconstitutional.

*(A) Purpose*

Defendant contends that although the Fort Bragg Provost Marshal's Office labeled the checkpoint operating procedures as "DWI Checking Station," the primary goal was a broader purpose of general crime enforcement. She asserts that this improper aim is evidenced by Tatro's contradictory testimony as to the stated purpose of the checkpoint as well as the equipment present at the checkpoint.

*(1) Tatro's testimony*

Plaintiff first argues that the stated purpose of the checkpoint is suspect based on Tatro's contradictory testimony. At the November 20, 2013 hearing on the motion to suppress, the following exchange occurred on the direct examination of Tatro:

> Q: And what was — based on that Operations Order, what was the purpose of the checkpoint conducted on March 17, 2012?
>
> A: A DWI checking station.

(DE 33 at 11:6–9). On cross-examination, the following testimony was elicited:

> Q: Okay. Do you recall informing (sic) that the checking station in question was a driver's license and compliance checking station?
>
> A: I do vaguely — yeah. I do remember saying that.

> Q: Do you recall when asked in a follow-up to that question by defense counsel whether you were checking for driver's license compliance and general violations of the law stating, "Yes, that, too?"
>
> A: I believe, yes.

(*Id*. at 21:18–22:1). Plaintiff contends that these exchanges belie the proffered reason for the checkpoint as checking for DWIs and that, in fact, the actual purpose of the checkpoint was much broader in scope. Plaintiff submits that the purported contradictory testimony by Tatro warrants closer scrutiny of the stated purpose of the checkpoint.

The government asserts that the purpose of the checkpoint was lawful and states that if, during the course of a checkpoint, officers uncover evidence of other crimes afoot, they are bound to investigate them. Although the Defendant contends that the government may not create a multiple purpose checkpoint which searches for general violations of the law by alleging the stated purpose is DWI enforcement, a single purpose checkpoint in not rendered illegal when additional criminal violations are discovered and charged. *See U.S. v. Henson*, No. 1:07-CR-53, 2007 WL 2429180, at *1 (W.D.N.C. Aug. 22, 2007) (noting that "if in the process of stopping a car at a roadblock to check the driver's license, the officers see evidence of another crime, they have the right to take reasonable investigative steps.") (citing *Texas v. Brown*, 460 U.S. 730 (1983); *United States v. Lopez*, 777 F.2d 543, 547 (10th Cir. 1985) ("The law does not require the police to ignore evidence of other crimes in conducting legitimate roadblocks[.]"))..

Thus, while out of context, Tatro's testimony may appear to confuse the purpose of the checkpoint, Tatro clearly stated that the purpose of the checkpoint was to check for DWI violations. (DE 33 at 11:6–9). This is supported by the Operations Order, definitively spelling out that it sought to reduce the incidents of impaired driving. (DE 30 at 10). Checking for license

compliance and general law violations discovered through the DWI checkpoint poses no constitutional issue in and of itself. *See Prouse*, 440 U.S. 648. Consequently, Defendant has failed to establish that Tatro's testimony undermines the stated purpose of the checkpoint.

      *(2) Equipment at checkpoint*

Plaintiff further asserts that the equipment present, or absent, from the checkpoint casts doubt on its stated purpose. First she maintains that the Bat Mobile, which is generally used in the detection of impaired drivers, was not present. She next maintains that the narcotics K-9s were likely on the scene to conduct open air sniffs for controlled substances. Finally, Plaintiff points out that law enforcement officials were directed to detain drivers who violated the Motor Vehicle Code or any other provision of the law, and to arrest drivers or to cite drivers for substantial violations of the law. She argues that these factors, taken together, suggest the checkpoint had multiple purposes.

These factors, even when viewed together, fail to cast discredit on the stated purpose of the checkpoint. First, the Defendant has produced no evidence that the Bat Mobile is required to conduct a DWI checkpoint so as to render its absence questionable. Additionally, Tatro could not recall whether a narcotics K-9 was present at the checkpoint. (DE 33 at 28:15–18). He testified further that, if a K-9 were present, it would conduct an open air sniff of the vehicle not at the initial stop but in the processing lane for vehicles that had already been found to have violations, such as a suspended license. (*Id*. at 32:8–10). As noted above, such additional investigation is not improper when other evidence of illegal activity is present, and officers are not required to ignore evidence of other crimes in conducting a legitimate checkpoint.

6

In sum, the Court does not find that these circumstances indicate that the checkpoint's purpose was an impermissible "general interest in crime control." Accordingly, her argument on this issue lacks merit.

*(B) Does Tatro's authority render checkpoint unreasonable?*

As noted above, if the primary purpose of a checkpoint is valid, the court must then evaluate the checkpoint's reasonableness. The Defendant does not challenge the visibility of the checkpoint nor the amount of time drivers were detained. She maintains that it is unreasonable for Lt. Tatro to have the authority to deciding the date, time, location and operating procedures of the checkpoint, the ability to create and to alter the pattern for stopping vehicles as well as his authority to terminate the checkpoint. She argues that such authority constitutes the unconstrained exercise of discretion by law enforcement, which lacks the proper safeguards to pass constitutional scrutiny. In support of her position, Defendant relies on *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed. 660 (1979). In *Prouse*, the Supreme Court held a discretionary, suspicionless stop for a "spot check" of a motorist's license and registration to be unconstitutional. *Id*. In doing so, it emphasized that "[t]his kind of standardless and unconstrained discretion is the evil the Court has discerned when in previous cases it has insisted that the discretion of the official in the field be circumscribed." *Id*. at 661. However, as the government notes, *Prouse* concerned a random, suspicionless stop of a single vehicle, which is quite different from the systematic checkpoint at issue here. Moreover, *Prouse* and subsequent cases have been clear that a license and registration checkpoints, in and of themselves, are not unconstitutional. *See Prouse*, 440 U.S. 648; *United States v. Brugal*, 209 F.3d 353, 357 (4th Cir. 2000) (en banc) (observing that "courts have concluded that a brief stop at a checkpoint for the

7

limited purpose of verifying a driver's license, vehicle registration, and proof of insurance is a reasonable intrusion into the lives of motorists and their passengers even in the absence of reasonable suspicion that a motorist or passenger is engaged in illegal activity.").

Tatro testified that he planned the checkpoint several weeks in advance and that he coordinated it with input from his supervisors from the Operations Cell. The existence of an Operations Order suggests that Tatro's authority was not as limitless as Plaintiff implies. Tatro testified that the decisions regarding setting up the checkpoint were made by him and the Operations Cell. (DE 33 at 8:8–9:8). In conjuction with the Operations Cell, the Operations Order was drafted and there was no discretion in which vehicles would be stopped, nor does the Defendant suggest there was deviation from the Operations Order. Thus, despite the fact that Plaintiff characterizes Tatro's authority to determine the date, time, location and logistics of the checkpoint, as well as to decide whether to purge the checkpoint, as "unbridled," his authority in conducting the checkpoint was neither exclusive nor unreasonable. Unlike the discretionary spot-check of a vehicle in *Prouse*, "checkpoint operations both appear to and actually do involve less discretionary enforcement activity." *U.S. v. Villamonte-Marquez*, 462 U.S. 579, 603, 103 S.Ct. 2573 (1983) (quoting *United States v. Martinez-Fuerte*, 428 U.S. 543, 558–559, 96 S.Ct. 3074, 3083, 49 L.Ed.2d 1116 (1976). Accordingly, Tatro's authority in executing the checkpoint activities is neither unreasonable nor unconstitutional.

## IV. CONCLUSION

For the aforementioned reasons, Defendant's Motion to Suppress (DE 28) is DENIED.

SO ORDERED in Chambers in Raleigh, North Carolina on December 6, 2013.

_____
WILLIAM A. WEBB
UNITED STATES MAGISTRATE JUDGE

9

Case 5:12-mj-01508-JG   Document 36   Filed 12/06/13   Page 9 of 9